1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

9   JANELL K. HOFFMAN, an individual,                    )
                                                         )
10                  Plaintiff,                            )        3:13-cv-0633-LRH-VPC
     v.                                                   )
11                                                        )
     RED WING BRANDS OF AMERICA, INC.,                    )        ORDER
12   a Minnesota corporation; JESSICA                     )
     HELSLEY, an individual; JASON PFAU, an               )
13   individual; and CHARLES CAVANAUGH,                   )
     an individual; inclusive,                            )
14                                                        )
                    Defendants.                           )
15   _____          )

16        This is a Title VII employment discrimination and retaliation case alleging sexual

17   harassment, hostile work environment, retaliation, intentional infliction of emotional distress

18   ("IIED"), and negligent retention against Plaintiff Janell Hoffman's ("Hoffman") employer Red

19   Wing Brands of America, Inc. ("Red Wing") and three of the company's employees.  Before the

20   Court are four Motions for Summary Judgment filed by Red Wing, Jason Pfau ("Pfau"), Charles

21   Cavanaugh ("Cavanaugh"), and Jessica Helsley ("Helsley").  Doc. ##61, 62, 63, 66.[1]  Hoffman

22   filed Oppositions (Doc. ##71, 73, 74, 75),[2] to which Defendants replied (Doc. ##90, 91, 92, 95).

23

24          [1] Refers to the Court's docket entry number.

25          [2] On May 13, 2015, Hoffman filed a Supplement to her Oppositions to Defendants' Motions.  Doc. #98.

26   This Supplement was filed approximately three months after Hoffman's Oppositions.  Hoffman did not request
     leave to file this late supplement.  The Court therefore grants Defendants' Motion to Strike the Supplement
     (Doc. #99), and denies Defendants Motion for Leave to File a Response (Doc. #100) as moot.

## I.    Facts and Background

Hoffman's allegations of sexual harassment and hostile work environment begin prior to her employment.  During Hoffman's interview with Red Wing Area Retail Manager Helsley and Regional Operations Manager Pfau on September 23, 2011, Hoffman was asked mostly traditional interview questions, and at one point Pfau asked "What are your feelings about relationships in the workplace?"  Red Wing subsequently offered Hoffman a position at the retail store located in Carson City, Nevada.  Hoffman accepted the position and began work on October 28, 2011.  This position began with a three to four month long "onboarding" process, during which Hoffman worked closely with Helsley at Red Wing's Reno store.  Hoffman alleges that throughout the onboarding process, she noticed Helsley and other female employees interact with customers in a highly sexualized manner.  Hoffman alleges that she was encouraged to act in a sexually suggestive manner to customers, but she declined.  Additionally, Hoffman alleges that Helsley told her about "special men," including customers with whom she and other female employees had sexual relationships.  Helsley told Hoffman that she and Pfau hired Hoffman because she was "hot."  Hoffman also alleges that Helsley routinely showed Hoffman nude photographs of herself prior to sending them to regular customers.

After this "onboarding" process, Helsley visited Hoffman frequently at the Carson City store.  Hoffman alleges that Helsley often engaged in sexual acts with customers in the back room of the store.  Helsley reported graphic details of these sexual acts to Hoffman.  Some of these customers subsequently asked Hoffman out on dates, and Helsley encouraged her to oblige.  On one occasion, Pfau spent an entire day at the Carson store with Hoffman, and Hoffman suspected that he was "vying for her romantic attention."[3]  On another occasion, Hoffman alleges that Helsley

///

///

---

[3] Hoffman stated in her deposition, however, that Pfau did not do anything inappropriate toward her that day. Doc. #64, Ex. A at 65:10-14.

brought her to an adult-themed store, "Naughty or Nice," where Helsley purchased lingerie.[4]

Hoffman alleges that Helsley was having a long-term sexual relationship with Cavanaugh, Red Wing's Territorial Sales Manager, and that Helsley reported graphic details about this sexual relationship to Hoffman.  Helsley added that Cavanaugh liked to have lunch with female employees, and it was understood that the employees were expected to perform oral sex at these lunches.  Hoffman alleges that during a managers' dinner on January 25, 2012, Cavanaugh made sexually suggestive comments about Helsley, at one point calling her a "ho."  Hoffman describes three interactions with Cavanaugh, during which she believes that he engaged in attempts to pressure her into engaging in sexual acts with him, although he never explicitly propositioned her. The third of these interactions occurred on April 20, 2012, when Cavanaugh visited Hoffman at the Carson City store for nearly three hours, and then lectured her about attitude and customer service.

The next day, on April 21, 2012, Red Wing employee Bruce Woodley ("Woodley") noticed that a return had been processed under his employee number.  The transaction occurred on April 17, 2012, when Helsley and Hoffman worked the cash register at the Carson City store together. On April 18, 2012, Hoffman arrived at work and saw a note from Helsley instructing her to return the shoes bought the day before.  Hoffman returned the shoes for cash, as Helsley had instructed her to do.  Upon noticing the return, Woodley called Helsley, whose first words were "Did she do something stupid?"  Helsley then contacted Pfau, who concluded that this constituted evidence of "cash theft" by Hoffman.  On May 2, 2012, Pfau conducted an inventory check of the Carson City store.  As a result of the April 17, 2012, transaction, and two other incidents of purported theft by Hoffman, Pfau terminated Hoffman for "gross misconduct" on May 2, 2012.  Regardless, Hoffman alleges that Pfau has never produced evidence that cash went missing.

Following her termination, Hoffman sought treatment from mental health professionals, who diagnosed Hoffman with post-traumatic stress disorder and major depressive disorder, finding

---

[4] Helsley states that it was Hoffman's idea to visit "Naughty or Nice," and that she had never heard of the store before she visited it with Hoffman.

1   that these disorders were exacerbated by Hoffman's treatment while employed at Red Wing.

2   Hoffman was also treated in the emergency room for physical disorders including severe

3   gastrointestinal distress allegedly inflamed by childhood memories that were triggered by

4   Hoffman's treatment at Red Wing.

5        On October 16, 2012, Hoffman filed a Chapter 7 bankruptcy petition in the U.S. Bankruptcy

6   Court for the District of Nevada.  *See* Doc. #65, Ex. A.  The petition's statement of financial affairs

7   instructed Hoffman to list "all suits and administrative proceedings to which the debtor is or was a

8   party within one year immediately proceeding" the filing of the bankruptcy petition.  Hoffman

9   listed a wrongful termination action titled "Hoffman vs. Redwing Shoe Co., Inc." as the sole

10  lawsuit to which she was a party.

11       Hoffman filed a claim with the Nevada Equal Rights Commission ("NERC") and later the

12  Equal Employment Opportunity Commission ("EEOC"), alleging violations of Title VII for hostile

13  work environment, retaliation, and quid pro quo sex discrimination.  Hoffman filed her Complaint

14  in the instant action on November 13, 2013, alleging causes of action for sex discrimination, quid

15  pro quo sex harassment, and retaliation in violation of Title VII, as well as state law claims for

16  defamation, IIED, negligent hiring, and negligent retention.  The parties engaged in a settlement

17  conference on October 30, 2014, and on January 13, 2015, the Court accepted the parties'

18  stipulation to dismiss Hoffman's fourth, sixth, and seventh causes of action with prejudice.  Doc.

19  ##53, 60.  Defendants Red Wing, Pfau, and Cavanaugh filed Motions for Summary Judgment on

20  January 16, 2015 (Doc. ##61, 62, 63), and Helsley filed her Motion for Summary Judgment on

21  January 20, 2015 (Doc. #66).  Five causes of action remain: (1) Title VII sex discrimination, based

22  on hostile work environment, against Red Wing; (2) Title VII sex discrimination, based on quid pro

23  quo sexual harassment, against Red Wing; (3) Title VII sex discrimination, based on retaliatory

24  termination, against Red Wing; (5) IIED against all defendants; and (8) negligent retention against

25  Red Wing.

26  ///

4

1    **II.     Legal Standard**

2        Summary judgment is appropriate only when the pleadings, depositions, answers to

3    interrogatories, affidavits or declarations, stipulations, admissions, and other materials in the record

4    show that "there is no genuine issue as to any material fact and the movant is entitled to judgment

5    as a matter of law." Fed. R. Civ. P. 56(a). In assessing a motion for summary judgment, the

6    evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the

7    light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio*

8    *Corp.*, 475 U.S. 574, 587 (1986); *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154

9    (9th Cir. 2001). A motion for summary judgment can be complete or partial, and must identify

10   "each claim or defense—or the part of each claim or defense—on which summary judgment is

11   sought." Fed. R. Civ. P. 56(a).

12       The party moving for summary judgment bears the initial burden of informing the court of

13   the basis for its motion, along with evidence showing the absence of any genuine issue of material

14   fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On those issues for which it bears the

15   burden of proof, the moving party must make a showing that no "reasonable jury could return a

16   verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On

17   an issue as to which the nonmoving party has the burden of proof, however, the moving party can

18   prevail merely by demonstrating that there is an absence of evidence to support an essential element

19   of the non-moving party's case. *Celotex*, 477 U.S. at 323.

20       To successfully rebut a motion for summary judgment, the nonmoving party must point to

21   facts supported by the record that demonstrate a genuine issue of material fact. *Reese v. Jefferson*

22   *Sch. Dist. No. 14J*, 208 F.3d 736, 738 (9th Cir. 2000). A "material fact" is a fact "that might affect

23   the outcome of the suit under the governing law." *Liberty Lobby*, 477 U.S. at 248. Where

24   reasonable minds could differ on the material facts at issue, summary judgment is not appropriate.

25   *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered

26   genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Liberty Lobby*, 477 U.S. at 248.  The mere existence of a scintilla of evidence in support of the party's position is insufficient to establish a genuine dispute; there must be evidence on which a jury could reasonably find for the party. *See id.* at 252.  "[S]peculative and conclusory arguments do not constitute the significantly probative evidence required to create a genuine issue of material fact." *Nolan v. Cleland*, 686 F.2d 806, 812 (9th Cir. 1982).

**III.   Discussion**

All four Defendants have moved for summary judgment.  All four pending motions allege first that Hoffman is judicially estopped from pursuing relief because she did not disclose the existence of the present claims in her bankruptcy petition. *See Ah Quin v. Cnty. of Kauai Dep't of Transp.*, 733 F.3d 267, 271 (9th Cir. 2013) ("If a plaintiff-debtor omits a pending (or soon-to-be-filed) lawsuit from the bankruptcy schedules and obtains a discharge (or plan confirmation), judicial estoppel bars the action.").  The Court therefore analyzes Defendants' judicial estoppel argument before discussing each Defendant's Motion for Summary Judgment in turn.[5]

**A.  Judicial Estoppel**

Red Wing argues that judicial estoppel applies because when Hoffman filed for bankruptcy on October 16, 2012, she listed a claim against "Red Wing Shoe Company" in the disclosure of pending lawsuits, which is a separate entity from "Red Wing Brands of America, Inc.," her actual employer. Doc. #61 at 7.  Pfau, Cavanaugh, and Helsley argue that judicial estoppel applies to bar Hoffman's claims against them because Hoffman only listed a wrongful termination claim against the employer, and did not list an IIED claim against any individual defendant.  Hoffman argues that the reference to Red Wing Shoes is just a typo, and that "she cannot be expected to understand the corporate layering of a multi-billion dollar company, nor was she required to strategically itemize

---

[5] On March 9, 2015, Helsley submitted a Memorandum of Objections to Evidence Submitted in Support of Hoffman's Opposition to Helsley's Motion for Summary Judgment.  Doc. #96.  The Court reviewed these objections, and conducted its own review of the evidence before the Court.  Where the Court has referred to evidence submitted in support of Hoffman's Opposition, the Court considers this evidence to be relevant and admissible at this time.

1  all theories of recovery a full year prior to filing her complaint." Doc. #71 at 35.  Hoffman has

2  requested leave to reopen her bankruptcy petition and enter a stipulation with her creditors to pay

3  them from any recovery she obtains in a settlement or at trial. *Id.* at 36.

4      "[J]udicial estoppel 'is an equitable doctrine invoked by a court at its discretion.'" *New*

5  *Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (quoting *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th

6  Cir. 1990)).  Although the doctrine of judicial estoppel is "not reducible to any general formulation

7  of principle," courts generally consider three factors: (1) whether the party's position is "clearly

8  inconsistent" with an earlier position; (2) "whether the party has succeeded in persuading a court to

9  accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later

10 proceeding would create the perception that either the first or the second court was misled"; and (3)

11 whether the party advancing an inconsistent position "would derive an unfair advantage or impose

12 an unfair detriment on the opposing party if not estopped." *Id.* at 750-51 (internal quotations

13 omitted).

14     "In the bankruptcy context, the federal courts have developed a basic default rule: If a

15 plaintiff-debtor omits a pending (or soon-to-be-filed) lawsuit from the bankruptcy schedules and

16 obtains a discharge (or plan confirmation), judicial estoppel bars the action." *Ah Quin*, 733 F.3d at

17 271; *see Hay v. First Interstate Bank of Kalispell, N.A.*, 978 F.2d 555, 557 (9th Cir. 1992) (finding

18 that a plaintiff's failure to give required notice to the bankruptcy court estopps the debtor and

19 justifies summary judgment in favor of the defendants); *Payless Wholesale Distribs., Inc. v. Alberto*

20 *Culver (P.R.) Inc.*, 989 F.2d 570, 571 (1st Cir. 1993) ("Conceal your claims; get rid of your

21 creditors on the cheap, and start over with a bundle of rights. This is a palpable fraud that the court

22 will not tolerate, even passively.").

23     Even when a bankruptcy petition omits material information, "it may be appropriate to

24 resist application of judicial estoppel when a party's prior position was based on inadvertence or

25 mistake." *New Hampshire*, 532 U.S. at 754 (internal quotation omitted).  The Ninth Circuit has

26 distinguished treatment of inadvertence or mistake based on whether the plaintiff disclosed a

mistaken omission and voluntarily reopened his or her bankruptcy case.  *Ah Quin*, 733 F.3d at 272-73.  In cases where the plaintiff disclosed the mistake and voluntarily re-opened the bankruptcy petition, the Ninth Circuit has rejected a "narrow interpretation" of inadvertence that asks merely "whether the debtor knew about the claim when he or she filed the bankruptcy schedules and whether the debtor had a motive to conceal the claim."  *Id.* at 271 (noting that the interpretation "is narrow in part because the motive to conceal claims from the bankruptcy court is . . . nearly always present").  However, "[w]hen a plaintiff-debtor has *not* reopened bankruptcy proceedings, a narrow exception for good faith is consistent with *New Hampshire* and with the policies animating the doctrine of judicial estoppel."  *Id.* at 272.

The central question here is whether Hoffman has met her burden to show the omissions in her bankruptcy petition were inadvertent.  In *Ah Quin*, the plaintiff swore in an affidavit that after reviewing the bankruptcy schedules, "she did not think that she had to disclose her pending lawsuit because the bankruptcy schedules were 'vague.'"  *Id.* at 277.  The plaintiff added that she would not have listed her lawyer as a creditor for $5000 if she was truly seeking to hide the lawsuit from the court.  *Id.* at 277-78.  Most importantly, Ah Quin reopened her bankruptcy petition when she learned of the omission, corrected the error, and allowed the bankruptcy court to re-assess her petition with the correct information.  *Id.* at 273.  Noting that at the summary judgment stage evidence must be viewed in the light most favorable to the non-moving party, which includes crediting the plaintiff's affidavit, the court found that a presumption of deceit was not appropriate, and reversed the district court's application of judicial estoppel.  *Id.* at 278-79.

As in *Ah Quin*, Hoffman's bankruptcy petition included information indicating that she did not intend to conceal her lawsuit in its entirety: she disclosed a wrongful termination lawsuit against "Red Wing Shoe Company."  That this disclosure included a slight deviation from her former employer's real name—"Red Wing Brands of America, Inc."—appears to be a good faith mistake, and nonetheless is not the type of deception that the doctrine of judicial estoppel is designed to prevent.  However, Hoffman's omission of the lawsuits against Pfau, Cavanaugh, and

8

Helsley for IIED, and failure to voluntarily reopen the bankruptcy action to correct these omissions, presents a more complicated question.  *See Cusano v. Klein*, 264 F.3d 936, 947 (9th Cir. 2001) ("Causes of action are separate assets which must be formally listed. . . . Simply listing the underlying asset out of which the cause of action arises is not sufficient.").  Because Hoffman never reopened her bankruptcy case to add her causes of action for IIED against Pfau, Cavanaugh, and Helsley, the Court is not convinced that it should apply the good faith exception to the doctrine of judicial estoppel.  *See Ah Quin*, 773 F.3d at 273 (noting that where the plaintiff did not correct an omission before the bankruptcy court, "it makes sense to apply a presumption of deliberate manipulation . . . given the strong need for full disclosure in bankruptcy proceedings and the fact that the plaintiff-debtor received an unfair advantage in the bankruptcy court").  In such cases, courts ask "whether the debtor knew about the claim when he or she filed the bankruptcy schedules and whether the detbor had a motive to conceal the claim." *Id.* at 271.  As the Ninth Circuit recognized in *Ah Quin*, these elements are most often present.  *Id.*

Based on the foregoing, the Court finds that the *New Hampshire* factors regarding judicial estoppel are all met as to Pfau, Cavanaugh, and Helsley: (1) Hoffman's present action is "clearly inconsistent" with her omission of these causes of action in her bankruptcy petition; (2) Hoffman succeeded in persuading the bankruptcy court to accept her earlier position; and (3) Hoffman would be advantaged if her claims against Pfau, Cavanaugh, and Helsley were allowed to proceed.  *New Hampshire*, 532 U.S. at 750-51.  As such, the Court would be within its discretion to apply judicial estoppel and grant summary judgment in favor of Pfau, Cavanaugh, and Helsley.  *See Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 784 (9th Cir. 2001) ("Judicial estoppel will be imposed when the debtor has knowledge of enough facts to know that a potential cause of action exists during the pendency of the bankruptcy, but fails to amend his schedules or disclosure statements to identify the cause of action as a contingent asset.").

However, the Ninth Circuit has criticized judicial estoppel that "operates to the detriment primarily of innocent creditors and to the benefit of only an alleged bad actor." *Ah Quin*, 733 F.3d

at 275.  *Ah Quin* reasoned that when judicial estoppel is applied, "the only 'winner' in this scenario is the alleged bad actor in the estopped lawsuit."  *Id.*  Moreover, allowing the lawsuit to proceed enables creditors to stake a claim in the lawsuit.  *Id.*  In another case, the Ninth Circuit approved of a separate course, allowing the plaintiff "to reopen his bankruptcy case, thereby giving the bankruptcy trustee an opportunity to administer the unscheduled claims."  *Dunmore v. United States*, 358 F.3d 1107, 1113 n.3 (9th Cir. 2004).  The court noted that "albeit cumbersome, this approach prevented Dunmore from whipsawing the Government by undoing the effect of his omission of claims from his bankruptcy schedule."  *Id.*

Hoffman has stated that the trustee of her creditors, Christina Lovato, has proposed allowing Hoffman to reopen her bankruptcy estate.  As such, Hoffman requests leave to reopen her bankruptcy petition and enter into a stipulation with her creditors to pay them out of any recovery that she receives from settlement or trial.  Doc. #71 at 36.  In the interest of preventing Hoffman from benefitting unfairly from her omissions, allowing her creditors to recover what they are owed, and preventing potentially bad actors from benefitting from estoppel, the Court finds that Hoffman's proposal to reopen her bankruptcy estate to correct her past omissions is appropriate.  Accordingly, the Court declines to grant Defendants Red Wing, Pfau, Cavanaugh, and Helsley's Motions based on judicial estoppel, and considers Defendants' Motions on the merits.

The Court further orders that Hoffman reopen her bankruptcy petition and enter into a stipulation with her creditors to pay them out of any recovery that she receives from settlement or trial.  Hoffman shall file a confirmation of the reopening of her bankruptcy petition and stipulation with creditors within ninety days of this Order.

### B.  Red Wing's Motion for Summary Judgment

Red Wing's Motion for Summary Judgment challenges Hoffman's second, third, fifth, and eighth causes of action.[6]

---

[6] Red Wing did not move for summary judgment on the merits of Hoffman's first cause of action, for Title VII sex discrimination based on hostile work environment.

10

**1.      Second Cause of Action – Quid Pro Quo Sexual Harassment**

Red Wing argues that this claim must be dismissed because no Red Wing employee demanded sexual favors as a condition of Hoffman's employment.  Hoffman conceded in her deposition that neither Pfau nor Cavanaugh explicitly sexually propositioned her.  Doc. #64, Ex. A at 437:4-6; *id.* at 76:6-23.  However, Hoffman does allege that Helsley sexually propositioned her at a New Years Eve party at Hoffman's house.  Doc. #75 at 12.  Red Wing argues that this proposition cannot constitute quid pro quo sexual harassment because Hoffman conceded that her employment was never conditioned on submission to Helsley's advances.  Moreover, Red Wing argues that even if Helsley's sexual proposition constituted quid pro quo sexual harassment, Red Wing cannot be held liable because Helsley and Hoffman were off duty, off premises, and not performing work for Red Wing.

Quid pro quo sexual harassment is established when "employers condition employment benefits on sexual favors."  *Ellison v. Brady*, 924 F.2d 872, 875 (9th Cir. 1991).  "In order to establish a prima facie case of quid pro quo sexual harassment, a complainant must show that an individual 'explicitly condition[ed] a job, a job benefit, or the absence of a job detriment, upon an employee's acceptance of sexual conduct.'" *Heyne v. Caruso*, 69 F.3d 1475, 1478 (9th Cir. 1995) (quoting *Nichols v. Frank*, 42 F.3d 503, 511 (9th Cir. 1994)).  "Such a claim may lie either when continued employment has been expressly conditioned on participation in sexual acts or when the supervisor's words or conduct would communicate to a reasonable woman in the employee's position that such participation is a condition of employment."  *Holly D. v. Cal. Inst. of Tech.*, 339 F.3d 1158, 1173 (9th Cir. 2003).  Thus, a plaintiff can establish a prima facie case of quid pro quo sexual harassment if a reasonable person in plaintiff's position "would have believed that her job depended on fulfilling" demands for sexual favors.  *Id.* at 1174.  Claims of implicit demands for sexual favors "require more than conclusory allegations."  *Id.*

This claim is based entirely on respondeat superior liability.  A plaintiff can establish vicarious liability in a Title VII harassment claim "only when the employer has empowered the

employee to take tangible employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2443 (2013) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). "If an employer does not attempt to confine decisionmaking power to a small number of individuals, . . . the employer may be held to have effectively delegated the power to take tangible employment actions to those employees on whose recommendations it relies." *Id.* at 2452.

Because Hoffman concedes that neither Pfau nor Cavanaugh explicitly sexually propositioned her, Hoffman's quid pro quo sexual harassment claim against Red Wing hinges on Helsley's alleged explicit sexual proposition, and Hoffman's claims that she was implicitly expected to perform sexual acts and act in a provocative manner to secure her job. Hoffman contends that at a New Years Eve party at Hoffman's home, Helsley threatened to perform oral sex on Hoffman. Doc. #75 at 12. Helsley contests this claim. Hoffman Ex. 3 at 71:16-19. Moreover, even if Helsley made such a threat, Hoffman has not identified any evidence in the record to indicate that Helsley made any statement conditioning Hoffman's continued employment on submitting to Helsley's alleged sexual proposition.

Hoffman also alleges that Cavanaugh's lunch invitation was an implicit sexual proposition because Helsley had told her that Cavanaugh routinely used such lunches to "get to know" female employees, and that it was expected that the employee would perform oral sex on Cavanaugh at these lunches. However, Hoffman's own statements resolve any dispute as to whether Hoffman's employment was conditioned on having lunch with Cavanaugh, much less engaging in sexual acts: Hoffman concedes that Helsley told Hoffman that she did not have to go to lunch with Cavanaugh if she did not want to. Doc. #64, Ex. A at 72:21-73:9 ("[Helsley] said that I didn't have to go if I didn't want to."). Thus, in addition to conceding that Cavanaugh never explicitly sexually propositioned her, Hoffman acknowledged that her continued employment was not conditioned on

12

this alleged implicit proposition through Cavanaugh's lunch invitation.  Thus, these lunches do not constitute an example of quid pro quo sexual harassment.  *See Holly D.*, 339 F.3d at 1173.

Hoffman argues that claims of quid pro quo harassment can be established not only by overt requests to engage in sexual acts, but also by suggesting that women must wear "shorter skirts" and "loosen up" to appease male customers to keep their jobs.  Doc. #71 at 22 (quoting *Burlington Indus.*, 524 U.S. at 748).  However, a review of the case law interpreting the language of *Burlington Industries* undermines Hoffman's argument.  In *Craig v. M & O Agencies, Inc.*, the plaintiff filed suit against her employer for quid pro quo sexual harassment based on the actions of her direct supervisor, who "made repeated inappropriate comments to Craig about her legs and how she should wear shorter skirts."  496 F.3d 1047, 1051 (9th Cir. 2007).  Craig's supervisor also directly sexually propositioned her on at least one occasion, and called her repeatedly on the phone thereafter.  *Id.* at 1052.  Craig reported the incidents, after which she felt that her supervisor retaliated against her, and after a period of months, Craig resigned.  *Id.* at 1052-53.  The Ninth Circuit rejected Craig's statement that "she felt she had to consent if she wanted to keep her job" as the basis for her quid pro quo claim because the assertion was not supported by any evidence in the record.  *Id.* at 1054.  The court based its ruling partially on the fact that other supervisors assured Craig that her job was not in jeopardy.  *Id.*

Unlike in *Craig*, Hoffman was not assured that she would not be fired in retaliation for reporting sexual harassment.  Also unlike *Craig*, Hoffman never reported sexual harassment to the human resources department.  Hoffman Ex. 2 at 235:1-4.  Pfau stated under oath that he was the sole individual who decided to terminate Hoffman.  Doc. #62, Ex. 1 ¶4.  Hoffman has not testified or identified any evidence that Pfau was aware of her allegations of sexual harassment.  *See id.* at 55:18-58:11, 64:10-66:22, 244:12-247:5, 413:16-416:15, 436:18-437:6 (portions of Hoffman's deposition in which she discusses conversations with Pfau, but never states that she informed Pfau of her sexual harassment claims).

///

Hoffman refers to Cavanaugh's "history of inappropriate sexual conduct at work, including at least one harassment complaint" to support her claim for quid pro quo sexual harassment.  Doc. #71 at 24.  In her narrative of facts, Hoffman refers to instances in which female Red Wing employees faced retaliation for reporting sexual harassment to human resources.  For example, Hoffman refers to one employee, who reported alleged sexual harassment by Cavanaugh to human resources and as a result did not receive a promotion.[7]  Hoffman Ex. 2 at 141:2-21.  Hoffman also refers to another employee who filed a complaint with human resources and as a result had her hours cut drastically.  *Id.* at 235:5-11.  Even if these allegations are true, they do not support a claim for quid pro quo sexual harassment, which requires a showing that the plaintiff's employment was conditioned on granting sexual favors.  *Heyne*, 69 F.3d at 1478.

The fact remains that Hoffman has not identified any evidence that she reported her alleged sexual harassment to Pfau or the human resources department.  Nor is there evidence in the record that Hoffman's employment was conditioned on her engaging in sexual favors, dressing a certain way, or flirting with customers.  Without such evidence, Hoffman's quid pro quo sexual harassment claim presents no facts upon which a reasonable jury could find that her employment was conditioned on acquiescence to sexual favors.  Accordingly, the Court grants Red Wing's Motion for Summary Judgment on Hoffman's quid pro quo sexual harassment claim against Red Wing.

## 2.     Third Cause of Action – Retaliation

Red Wing argues that Hoffman's claim for retaliation must fail because she cannot establish that she opposed any sexual harassment, and even if she did, Hoffman cannot establish that this opposition was the "but for" cause of her termination.  Hoffman responds that her retaliation claim is predicated on a suggestion to Helsley that she wanted to approach human resources to report sexual harassment, and her post-termination report.

---

[7] Hoffman states that she learned of these incidents from Helsley.  However, Helsley states that she was not aware that this employee had filed a sexual harassment claim against Cavanaugh, and that she did not tell Hoffman that she had.  Hoffman Ex. 3 at 114:14-20.

Title VII prohibits retaliation by making it unlawful "for an employer to discriminate against any of [its] employees . . . because [she] has opposed any practice that is made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). Courts employ the burden-shifting framework articulated by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to analyze claims of retaliation under Title VII. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1034-35 (9th Cir. 2006). First, the plaintiff has the burden to establish a *prima facie* case of retaliation. *McDonnell Douglas*, 411 U.S. at 802. If the plaintiff meets this burden, then the defendant must "articulate some legitimate, nondiscriminatory reason" for the alleged retaliatory action. *Id.* If the defendant does so, then the burden shifts back to the plaintiff to show that defendant's asserted nondiscriminatory reason for the challenged act was "mere pretext." *Id.* at 804. While the *McDonnell Douglas* analysis involves a shift in the burden of *proof*, the "plaintiff retains the burden of *persuasion*" throughout. *Tex. Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 256 (1981) (emphasis added). In order to establish a claim for retaliation, the plaintiff must establish that her protected activity was the "but for" cause of the retaliation. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013).

The Court is satisfied that Red Wing raised a legitimate nondiscriminatory reason for ending Hoffman's employment: Pfau states that Hoffman was terminated because he discovered evidence that she "falsified customer return transactions in order to steal cash from Red Wing." Doc. #61, Ex. 1 ¶4. Thus, assuming without deciding that Hoffman can establish a prima facie case of retaliation,[8] her claim fails unless she can identify evidence that Red Wing's legitimate reason for her termination was merely pretext for retaliation. *McDonnell Douglas*, 411 U.S. at 802.

///

---

[8] To establish a *prima facie* case of retaliation, a plaintiff must show (1) involvement in a protected activity, (2) an adverse employment action, and (3) a causal link between the two. *Thomas v. City of Beaverton*, 379 F.3d 802, 811 (9th Cir. 2004). Red Wing raises a strong argument that Hoffman did not raise a prima facie case of retaliation because she did not engage in a protected activity. Because the Court finds that Hoffman cannot establish that her termination was a pretext for retaliation, the Court need not determine whether Hoffman raises a prima facie case of retaliation.

15

A plaintiff can show that an employer's purported legitimate, nondiscriminatory explanation for an employment action was merely pretext for retaliation directly by establishing that retaliation "more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256.  When a plaintiff proffers circumstantial evidence of pretext, this evidence "must be 'specific' and 'substantial' in order to create a triable issue with respect to whether" the employer's justifications are pretext for discrimination or retaliation. *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998). If the evidence shows that there may be both legitimate and illegitimate reasons for an adverse employment action, the plaintiff must establish that the discriminatory or retaliatory reason was a "motivating factor" for the adverse employment action. *Steagall v. Citadel Broad. Co.*, 350 F.3d 1061, 1067 (9th Cir. 2003) (quoting *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 856-57 (9th Cir. 2002)).

Hoffman has not identified any evidence that her statement to Helsley that she wanted to approach human resources was communicated to Pfau, or that he decided to fire Hoffman in retaliation for this preemptive protected activity.  Hoffman only met Pfau on three occasions: when she was hired, when she was fired, and one day when he visited the store.  Doc. #64, Ex A at 64:18-23.  Pfau has stated that he had no knowledge of Hoffman being subjected to sexual harassment. Doc. #61, Ex. 1 ¶¶5-6.  Hoffman's allegation that Red Wing's investigation into her alleged cash theft was initiated to discover a legitimate reason to fire her—pretext for retaliation—is not supported by specific or substantial evidence to create a triable issue of fact for the jury.  For this reason, Hoffman has not met her burden to establish that the reason for her termination was mere pretext for retaliation.

Hoffman also has not established that Red Wing's ratification of her termination constituted actionable retaliation.  Hoffman alleges that Red Wing ratified the retaliation by failing to vacate the "gross misconduct" that led to her termination, which would have vindicated her and led to a potential re-hiring.  Employers can be held liable for retaliation based on post-termination actions.

*See Hashimoto v. Dalton*, 118 F.3d 671, 676 (9th Cir. 1997) (finding that dissemination of adverse employment references can constitute retaliation under Title VII). However, *Hashimoto* involved an employer who affirmatively took steps to take an adverse employment action against the former employee. Here, Hoffman seeks to apply post-employment retaliation for an omission—Red Wing's decision not to grant administrative leave and consider re-hiring her. Hoffman has not identified any authority to indicate that a failure to act constitutes post-employment ratification of retaliation, nor is the Court aware of such precedent.

Based on the foregoing, Hoffman has failed to identify more than a scintilla of evidence to indicate that she faced retaliation in violation of Title VII, or that she participated in a protected activity at all. Accordingly, the Court grants Red Wing's Motion for Summary Judgment on Hoffman's retaliation claim.

### 3. Fifth Cause of Action – IIED

Hoffman's fifth cause of action for IIED is based entirely on respondeat superior liability. As discussed below, Hoffman has raised a genuine dispute of material fact on her claim for IIED against Helsley. Because much of the conduct that Hoffman alleged against Helsley occurred in the course of her employment, Hoffman has raised a genuine dispute of material fact on her respondeat superior IIED claim against Red Wing. *See Wood v. Safeway, Inc.*, 121 P.3d 1026, 1036 (Nev. 2005) (finding that an employer may be held vicariously liable for the tortious conduct of its employees when the employees' conduct was in furtherance of their employment or within the scope of their employment); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 794-95, 802-03 (1998) (noting that many courts have held employers liable for intentional torts by supervisors even when the act did not "serve the employer," and that "a harassing supervisor is always assisted in his misconduct by the supervisory relationship"). Applying Nevada law, the Ninth Circuit has held that whether the employer can be liable for a supervisor's extreme and outrageous conduct is a question of fact that precludes summary judgment. *Steiner v. Showboat Operating Co.*, 25 F.3d ///

1459, 1466-67 (9th Cir. 1994).  Accordingly, the Court denies Red Wing's Motion for Summary

Judgment on Helsley's IIED claim.

### 4.       Eighth Cause of Action – Negligent Retention

Hoffman alleges that Red Wing should be held liable for negligently hiring and retaining

Cavanaugh despite purported knowledge that he propositioned female employees for sexual favors.

"As is the case in hiring an employee, the employer has a duty to use reasonable care in the

training, supervision, and retention of his or her employees to make sure that the employees are fit

for their positions." *Hall v. SSF, Inc.*, 930 P.2d 94, 99 (Nev. 1996).  To succeed on a claim for

negligent retention, a plaintiff must establish that: (1) defendant owed a duty of care to the plaintiff;

(2) defendant breached that duty by hiring, retaining, and/or supervising an employee even though

defendant knew, or should have known, of the employee's dangerous propensities; (3) the breach

was the cause of plaintiff's injuries; and (4) damages. *Id.*

Central to the parties' argument on this cause of action is whether a claim for negligent

retention can survive absent an allegation of physical harm.  One court in this district found that a

claim for negligent retention based on subsequent sexual harassment could not survive absent an

allegation of physical harm.  *Hall v. Raley's,* No. 3:08-cv-0632, 2010 WL 55332, at *9 (D. Nev.

Jan. 6, 2010).  Another court in this district referenced disagreement between states and courts in

this district regarding whether a claim could lie for negligent retention absent allegations of

physical injuries, and certified this question to the Nevada Supreme Court: "Does a claim for

Negligent Training and Supervision in Nevada require that the plaintiff suffer physical harm as a

result of the employer's negligence in training or supervising the employee that terminated the

plaintiff?"  *Robertson v. Wynn Las Vegas LLC*, No. 2:10-cv-0303, 2010 WL 3168239, at *5 (D.

Nev. Aug. 9, 2009).  *Robertson* was subsequently dismissed, and the Nevada Supreme Court never

answered the certified question.  *See Brophy v. Day & Zimmerman Hawthorne Corp*., 799 F. Supp.

2d 1185, 1201 (D. Nev. 2011).  This Court has noted that "[t]he Nevada Supreme Court has not yet

addressed the physical harm requirement, and '[i]n the absence of conclusive authority, the court

will not graft a physical injury requirement onto the tort of'" negligent supervision.[9]  *Okeke v.*

*Biomat USA, Inc.*, 927 F. Supp. 2d 1021, 1028 n.4 (D. Nev. 2013) (quoting *Daisley v. Riggs Bank,*

*N.A.*, 372 F. Supp. 2d 61, 81 (D.D.C. 2005)).

Hoffman's own statements preclude any dispute as to whether she could prevail on a claim for negligent retention of Cavanaugh against Red Wing.  First, Hoffman acknowledged in her deposition that she did not know anything about Cavanaugh's past that would have alerted Red Wing not to hire him. Doc. #64, Ex. A at 139:25-140:4.  Second, Hoffman acknowledged that Cavanaugh has never acted violently toward her.  *Id.* at 142:6-10.  Third, Hoffman acknowledged that Cavanaugh has never explicitly sexually propositioned her.  *Id.* at 76:14-17.  Thus, even if Hoffman could establish a dispute as to whether Cavanaugh had dangerous propensities, and whether Red Wing knew about these propensities, Hoffman has not referred to any evidence that she suffered damages as a result of Cavanaugh's conduct, a necessary element of a negligent retention claim.  *See Hall*, 930 P.2d at 99.  Accordingly, the Court grants Red Wing's Motion for Summary Judgment on Hoffman's negligent retention claim.

### C. Pfau's Motion for Summary Judgment

Hoffman's sole claim against Pfau is for intentional infliction of emotional distress.  To establish a claim for IIED, a plaintiff must show: (1) extreme or outrageous conduct by defendant; (2) that plaintiff suffered severe emotional distress; and (3) actual or proximate causation.  *Dillard Dep't Stores, Inc. v. Beckwith*, 989 P.2d 882, 886 (Nev. 1999).  Extreme and outrageous conduct is that which is "outside all possible bounds of decency" and is intolerable in civil life.  *Maduike v. Agency Rent-A-Car*, 953 P.2d 24, 25 (Nev. 1998).  "Liability for emotional distress generally does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."  *Burns v. Mayer*, 175 F. Supp. 2d 1259, 1268 (D. Nev. 2001) (internal quotation omitted).

---

[9] Notably, the majority approach (including California law, which is especially persuasive authority in Nevada) does not require physical harm. *See* Nesheba M. Kittling, *Negligent Hiring and Negligent Retention: A State–by–State Analysis, ABA 4th Annual Section of Labor and Employment Law Conference* (Nov. 6, 2010), available at http://abalel.omnibooksonline.com/2010/data/papers/087.pdf.

Hoffman refers to a number of instances of Pfau's allegedly extreme and outrageous conduct: (1) he asked how Hoffman felt about relationships in the workplace during her interview; (2) he accused Hoffman of theft and fired her without conducting a full investigation; (3) Pfau knew about Hoffman's alleged sexual harassment, "but nonetheless intentionally chose a course of action that sanctioned and protected the misconduct of Helsley and Cavanaugh."  Doc. #73 at 8.

None of Hoffman's allegations against Pfau rise to the level of extreme and outrageous conduct.  Hoffman has acknowledged that Pfau's interview question, inquiring how Hoffman feels about workplace relationships, could be interpreted as disapproving of such relationships.  Doc. #64, Ex. A at 436:18-24.  Additionally, this question, by itself, does not rise to the level of extreme and outrageous conduct that is actionable in a claim for IIED.  *See Burns*, 175 F. Supp. 2d at 1268 (liability does not extend for "insults, indignities, threats, annoyances, petty oppressions, or other trivialities").  To the extent that Hoffman's claim for IIED against Pfau is based on his decision to fire her, this fails as a matter of law to state a cause of action for IIED.  *See Brooks v. Hilton Casinos, Inc.*, 959 F.2d 757, 766 (9th Cir. 1992) ("Even had plaintiffs managed to establish that the terminations were wrongful, Nevada does not recognize a cause of action for intentional infliction of emotional distress in the employment termination context.").  Finally, Hoffman has not identified any evidence in the record that Pfau knew that Hoffman was undergoing sexual harassment, and yet failed to address it.[10]  Hoffman referred to a portion of Pfau's deposition as evidence that "it can be expected that Pfau knew of [Cavanaugh's] proclivities," but the cited portion of the deposition does not stand for this proposition.  Hoffman Ex. 4 at 49:3-10.[11]

---

[10] Hoffman's Opposition often refers to exhibits in general, often without identifying a page number or page number range. *See* Doc. #73 at 6-7.  In determining whether to grant or deny summary judgment, it is not a court's task "to scour the record in search of a genuine issue of triable fact."  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal quotation marks omitted).  Rather, a court is entitled to rely on the nonmoving party to "identify with reasonable particularity the evidence that precludes summary judgment." *Id.*  Regardless, the Court has reviewed these exhibits and has not discovered evidence that Pfau knew of Cavanaugh's alleged sexual harassment and still failed to act.

[11] Question: "You said that you shadowed him, so you were living and working in San Francisco. He was living and working in Carson City. During this, you said 90 to 120 days . . . in which you were shadowing

Extreme or outrageous conduct is required to establish a claim for IIED.  Because Hoffman has failed to identify any evidence that Pfau acted with extreme or outrageous conduct, the Court grants Pfau's Motion for Summary Judgment.  *See Schneider v. TRW, Inc.*, 938 F.2d 986, 992 (9th Cir. 1991) ("Summary judgment is proper if a claim cannot reasonably be regarded as so extreme and outrageous as to permit recovery.").

### D.  Cavanaugh's Motion for Summary Judgment

Hoffman's sole claim against Cavanaugh is for intentional infliction of emotional distress.  To establish a claim for IIED, a plaintiff must show: (1) extreme or outrageous conduct by defendant; (2) that plaintiff suffered severe emotional distress; and (3) actual or proximate causation.  *Beckwith*, 989 P.2d at 886.  Extreme and outrageous conduct is that which is "outside all possible bounds of decency" and is intolerable in civil life.  *Maduike*, 953 P.2d at 25.  "Liability for emotional distress generally does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."  *Burns*, 175 F. Supp. 2d at 1268 (internal quotation omitted).

Hoffman's Opposition identifies a number of actions that she characterizes as extreme and outrageous: (1) Cavanaugh invited Hoffman to lunch and allegedly asked Helsley to announce that he was coming for lunch; (2) Hoffman learned that lunches with Cavanaugh had "sexual connotations"; (3) other female employees had accused Cavanaugh of sexual harassment in the past; and (4) Cavanaugh took part in the alleged scheme to frame Hoffman for theft and get her fired.  Doc. #74 at 8-9.

Hoffman has not identified more than a scintilla of evidence that Cavanaugh engaged in extreme and outrageous conduct to support a claim for IIED.  First, Hoffman has conceded that Cavanaugh never told Hoffman that he wanted to have sex with her, or that he was asking her to lunch to request sexual favors.  Doc. #64, Ex. A at 71:10-72:15, 76:6-23.  Moreover, there are

---

Charlie Cavanaugh, how many of those days were you actually physically with Mr. Cavanaugh during your work?"  Answer: "I would say half to two thirds."

many innocent reasons why Red Wing's Territorial Sales Manager would want to have lunch with a local store manager.  Second, although Hoffman identified evidence indicating that Cavanaugh engaged in sexual acts with another female employee at lunch prior to Hoffman's employment, and faced a prior sexual harassment allegation,[12] such evidence does not indicate that Cavanaugh acted with extreme and outrageous conduct *toward Hoffman*.  *See Schneider*, 938 F.2d at 992 (finding that a supervisor's instruction to "get rid of the Bulgarian bitch" did not support a cause of action for IIED because the comment was not communicated to her directly, and there was no evidence that she was aware of it before depositions).  Third, the harassment claim to which Hoffman refers has to do with an allegation of gender bias, where the employee complained to Pfau that Cavanaugh made statements that Red Wing needed strong arms to move equipment, which the employee interpreted as a preference for male employees.  Hoffman Ex. 11 at 67:10-16.  This does not relate to the type of sexual harassment that Hoffman alleges supports IIED, and even so, would not rise to the level of extreme and outrageous conduct.  *See Burns*, 175 F. Supp. 2d at 1268 (liability does not extend for "insults, indignities, threats, annoyances, petty oppressions, or other trivialities").  Fourth, to the extent that Hoffman's claim for IIED is based on wrongful termination, this fails as a matter of law to state a cause of action for IIED.  *See Brooks*, 959 F.2d at 766 ("Even had plaintiffs managed to establish that the terminations were wrongful, Nevada does not recognize a cause of action for intentional infliction of emotional distress in the employment termination context.").

Extreme or outrageous conduct is required to establish a claim for IIED.  Because Hoffman has failed to identify sufficient evidence that Cavanaugh acted with extreme or outrageous conduct toward her, the Court grants Cavanaugh's Motion for Summary Judgment.  *See Schneider*, 938

///

---

[12] Jamie Puckett ("Puckett"), a female Red Wing employee, stated in her deposition that another female employee went on a three-hour lunch with Cavanaugh, and that both Cavanaugh and the employee acted odd when they returned. Hoffman Ex. 8 at 48:14-50:20.  Additionally, Cavanaugh acknowledged in his deposition that another employee complained to Pfau about statements he made to her at lunch—that they would need strong arms to help move some equipment. Hoffman Ex. 11 at 67:10-16.  Cavanaugh states that the employee viewed this as gender bias because it indicated that men would be more fit for the job.  *Id.*

F.2d at 992 ("Summary judgment is proper if a claim cannot reasonably be regarded as so extreme and outrageous as to permit recovery.").

### E. Helsley's Motion for Summary Judgment

Hoffman's sole claim against Helsley is for intentional infliction of emotional distress.  To establish a claim for IIED, a plaintiff must show: (1) extreme or outrageous conduct by defendant; (2) that plaintiff suffered severe emotional distress; and (3) actual or proximate causation. *Beckwith*, 989 P.2d at 886.  Extreme and outrageous conduct is that which is "outside all possible bounds of decency" and is intolerable in civil life.  *Maduike*, 953 P.2d at 25.  "Liability for emotional distress generally does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."  *Burns*, 175 F. Supp. 2d at 1268 (internal quotation omitted).

### 1.      Extreme or Outrageous Conduct

Hoffman alleges a number of actions by Helsley that she claims are extreme or outrageous: (1) Helsley entered her home and threatened oral sex; (2) Helsley sent Hoffman nude photographs and coerced Hoffman to take a photograph of Helsley wearing lingerie in the middle of a Red Wing store to send to a customer; (3) Helsley engaged in sexual acts with customers in the store, and encouraged Hoffman to do the same; (4) Helsley encouraged Hoffman to submit to Cavanaugh's alleged implicit sexual proposition; and (5) Helsley did not take Hoffman seriously when she complained about being harassed by customers.  Doc. #75 at 8-9.  The Court finds that if shown to be true, a reasonable jury could find that the combination of these actions are sufficiently extreme or outrageous to support a claim for IIED.

Helsley argues that Hoffman's claims must fail because she has not produced any evidence that Helsley's actions were intentional.  Doc. #66 at 13.  Hoffman states that "[i]t is intentional when the supervisor tells the employee about another supervisor's sexual proclivities with female employees and yet another supervisor's attraction to her, then serves as the harbinger of each's arrival."  Doc. #75 at 9.  To establish a claim for IIED, a plaintiff must establish *either* intent to cause emotional distress, *or* reckless disregard for the possibility of causing emotional distress.

*Beckwith*, 989 P.2d at 886.  Viewing the evidence in the light most favorable to Hoffman, she has presented evidence that Helsley acted with reckless disregard of the possibility of causing Hoffman emotional distress.  Helsley contests each of Hoffman's allegations of extreme conduct: that she threatened oral sex while in Hoffman's home, that she sent nude self-portraits to Hoffman, that she engaged in sexual acts with customers in the store, and encouraged Hoffman to do the same, did not help Hoffman when she complained about harassment from customers, and encouraged Hoffman to have lunch with Cavanaugh.  The parties' disagreement raises a genuine dispute of material fact that must be resolved by a jury.  *See United States v. Delgado*, 357 F.3d 1061, 1068 (9th Cir. 2004) ("[T]he credibility of witnesses is a question for the jury.").

Helsley also argues, and Hoffman disputes, that Hoffman participated in the acts that she now claims are evidence of extreme and outrageous conduct.  Doc. #66 at 13.  The question of whether Hoffman participated in Helsley's acts that she now claims were extreme and outrageous is also a question of fact that must be resolved by a jury.  *Delgado*, 357 F.3d at 1068.  Based on the foregoing, Hoffman has raised a genuine dispute as to whether Helsley's actions were extreme and outrageous to support a claim for IIED.

## 2.    Severe Emotional Distress

Hoffman alleges that her general practitioner increased her dosage of Xanax to the maximum while she worked at Red Wing, that she visited a psychiatrist soon after her termination, and that she has been "admitted to the hospital numerous times for rectal bleeding, gastrological distress, headaches, and heart palpitations directly resulting from stress over memories of her torment."  Doc. #75 at 13; *see* Hoffman Ex. 50 (records from St. Mary's Regional Medical Center).

To establish a claim for IIED, a plaintiff must establish that she suffered severe emotional distress.  *Beckwith*, 989 P.2d at 886.  "General physical or emotional discomfort is insufficient to demonstrate severe emotional distress."  *Switzer v. Rivera*, 174 F. Supp. 2d 1097, 1108 (D. Nev. 2001).  "[W]hile medical evidence is one acceptable manner in establishing that severe emotional distress was suffered for purposes of an IIED claim, other objectively verifiable evidence may

suffice to establish a claim when the defendant's conduct is more extreme, and thus, requires less evidence of the physical injury suffered." *Franchise Tax Bd. of Cal. v. Hyatt*, 335 P.3d 125, 148 (Nev. 2014).

Hoffman has produced medical evidence showing physical injuries that she sustained allegedly as a result of her treatment by Helsley and general employment at Red Wing.  This is sufficient to create a genuine dispute of material fact to support Hoffman's claim for IIED.

### 3.     Actual or Proximate Causation

Hoffman states that a reasonable jury could find that her severe emotional distress was caused by Helsley and Red Wing because her dosage of Xanax increased during her Red Wing employment, she saw a psychiatrist after her termination, and her hospital visits occurred following her termination.  Doc. #75 at 13.

To establish a claim for IIED, a plaintiff must establish that the defendant's extreme or outrageous conduct caused her severe emotional distress.  *Beckwith*, 989 P.2d at 886.  Courts frequently determine that the causation element of an IIED claim is a question of fact to be determined by a jury.  *See DeJean v. FedEx Ground Package Sys. Inc.*, No. 13-6194, 2013 WL 5798548, at *5 (C.D. Cal. Oct. 25, 2013) ("[A]s for the third element [of IIED], proximate cause . . . is a question of fact not to be determined at the demurrer stage.") (internal quotation omitted); *Fonseca v. City of Fresno*, No. 1:10-cv-0147, 2012 WL 44041, at *15 (E.D. Cal. Jan. 9, 2012) ("Proximate cause . . . is generally a question of fact for the jury.").

As discussed above, Hoffman has raised a dispute of material fact as to whether Helsley's conduct was extreme or outrageous, and whether she suffered severe emotional distress to support her claim for IIED.  If Hoffman is able to prove these elements at trial, it appears at this time that a reasonable jury could find that Helsley's conduct was a proximate cause of Hoffman's injuries. Accordingly, the Court denies Helsley's Motion for Summary Judgment.

///

///

1   **IV.     Conclusion**

2       IT IS THEREFORE ORDERED that Red Wing's Motion for Summary Judgment (Doc.

3   #61) is GRANTED in part and DENIED in part.  The Court grants summary judgment on

4   Hoffman's claims for quid pro quo sexual harassment, retaliation, and negligent retention.  The

5   Court denies summary judgment on Hoffman's claim for IIED.

6       IT IS FURTHER ORDERED that Pfau's Motion for Summary Judgment (Doc. #62) is

7   GRANTED.

8       IT IS FURTHER ORDERED that Cavanaugh's Motion for Summary Judgment (Doc. #63)

9   is GRANTED.

10      IT IS FURTHER ORDERED that Helsley's Motion for Summary Judgment (Doc. #66) is

11  DENIED.

12      IT IS FURTHER ORDERED that Defendants' Motion to Strike Hoffman's Supplemental

13  Opposition (Doc. #99) is GRANTED.

14      IT IS FURTHER ORDERED that Defendants' Motion for Leave to File a Response to

15  Hoffman's Supplemental Opposition (Doc. #100) is DENIED as moot.

16      IT IS FURTHER ORDERED that Hoffman shall reopen her bankruptcy petition and enter

17  into a stipulation with her creditors to pay them out of any recovery that she receives from

18  settlement or trial.  Hoffman shall file a confirmation of these actions within ninety (90) days of

19  this Order.

20      IT IS FURTHER ORDERED that this case is stayed pending the Court's receipt of

21  Hoffman's confirmation that she reopened her bankruptcy petition and entered into a stipulation for

22  payment with her creditors.

23      IT IS SO ORDERED.

24      DATED this 24th day of June, 2015.

25                                                    _____
                                                      LARRY R. HICKS
26                                                    UNITED STATES DISTRICT JUDGE